UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------X
CYNTHIA WARREN

      Plaintiff,              <u>MEMORANDUM AND ORDER</u>

   -against-               Civil Action No.
                            CV-03-0019(DGT)(RML)

NORTH SHORE UNIVERSITY HOSPITAL
AT FOREST HILLS

      Defendant.

----------------------------X

Trager, J:

    Plaintiff Cynthia Warren ("plaintiff") brings this employment discrimination case against her former employer, the North Shore University Hospital at Forest Hills ("Hospital" or "defendant").  Plaintiff alleges that she was treated adversely on account of her race, in violation of 42 U.S.C. § 1981 ("Section 1981"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) <u>et. seq.</u> ("Title VII"); the New York State Executive Law, §§ 290 <u>et. seq.</u> ("HRL"); and the New York City Human Rights Law § 8-1107(a) of the Administrative Code of the City of New York ("NYCHRL").  Plaintiff additionally alleges that she was subjected to disparate treatment in retaliation for complaining about the discrimination, in violation of Section 1981 and Title VII.  Defendant moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

**Background**

Plaintiff, an African-American woman, is a Physician Assistant ("PA") with over 25 years of experience in the health care industry.  Pl.'s Ex. 1.  From 1981 to 1992, plaintiff worked as a nurse in the operating room ("OR") of three hospitals in California.  Id.  In 1992 she went back to school to receive additional training to become a PA, graduating in 1994.  Id. Upon graduating, she worked as a PA in the Hospital for Special Surgery and Brookdale Hospital, both in New York.  In these hospitals she worked mostly in emergency medicine and pre- and post-operative care.  Id.

Plaintiff was hired as a PA by the North Shore University Hospital in October 1997.  Upon her hiring, plaintiff was assigned to Pre-Admission Testing in the Anesthesia Department. Dep. of Cynthia Warren ("Warren Dep.") 40:10-19.  Her responsibilities in this position included seeing patients who were coming to the hospital for surgery, evaluating blood work, ordering X-rays, and handling patient education.  Id. at 52:23-54:3.  Soon after starting work, plaintiff informed the Human Resources Department of her desire to transfer to the Surgical Department when a position opened up.  Id. at 56:7-12.  She was interested in working for the Surgical Department because of its higher salary and greater opportunity for overtime pay.  Id. at 230:20-25

In November 1999, while plaintiff was on medical leave for rheumatoid arthritis, the hospital hired Stacey Slovin, a

2

Caucasian, as a PA in the Surgical Department.  The decision to hire Ms. Slovin was made by Dr. John Cosgrove, then the Head of the Surgical Department.  Aff. of Dr. John Cosgrove ("Cosgrove Aff.") ¶¶ 6-7.  Hospital policy did not require the personnel department to advertise any openings.  Dep. of Monica Rauls ("Rauls Dep.") 12:4-12.  When plaintiff returned from medical leave, she learned of Ms. Slovin's hiring.  She informed Dr. Cosgrove and Monica Rauls, the Director of Human Resources for the Hospital, that she would like to be notified of any future openings in the Surgical Department.  Warren Dep. 68:15-20.  Plaintiff could not recall ever informing Dr. Cosgrove of her desire prior to this occasion.  Id. at 66:15.  At the time, plaintiff did not file any complaints alleging that the hiring of Ms. Slovin was due to racial discrimination.  Id. at 74:11-14.  At her deposition for this litigation, however, plaintiff claimed that the hiring decision was racially motivated, as she was "well qualified" for the position.  Id. at 72:14-15.

Early in 2000, Dr. Paul Ackerman was appointed as the Director of Orthopedics in the Hospital.  Dep. of Dr. Paul Ackerman ("Ackerman Dep.") 6:7-21.  His responsibilities as Director included the recruitment and hiring of staff for his department.  Id at 10:15-18.  As part of an initiative to expand the Orthopedic Department, Dr. Ackerman sought to hire additional PAs.  Aff. of Renata Hartung ("Hartung Aff.") ¶ 6.  Prior to this initiative, the Orthopedic Department had only two PAs, one of whom was Renata Hartung, an African-American woman.  Ackerman

Dep. 9:12-21; Hartung Aff. ¶ 5. Two of the main criteria that Dr. Ackerman looked for in his new hires were enthusiasm and a "really pro-patient" attitude. Ackerman Dep. 12:10-13:9. When plaintiff heard of these openings, she requested an interview with Dr. Ackerman, which was soon granted. Warren Dep. 75:11-76:21; Ackerman Dep. 21:9-14. Following the interview, Dr. Ackerman asked others in the Hospital about their experiences working with plaintiff. After speaking with two members of the Orthopedics Department – Drs. Reddy and Singha – he walked away with a negative opinion of plaintiff because she "wasn't really good with patients." Id. at 21:19-22:17. Ms. Hartung was asked by one of Dr. Ackerman's associates whether plaintiff had any recent surgical experience. Hartung replied that she was not aware of any such experience. Hartung Aff. ¶ 7. Dr. Ackerman chose not to hire plaintiff, hiring three Caucasian males instead. Def.'s Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Def's 56.1 Stmt.") ¶ 26. All three were recent graduates of a PA program, and had recent training in operating room and direct patient care. Id. at ¶ 27. Plaintiff claims that discrimination was the cause of her non-hiring for the lateral position. Warren Dep. 85:14-17. Despite her many years of experience, she was passed over, and three recent graduates were hired instead. The Hospital responds that the decision not to hire plaintiff had nothing to do with race. Work experience was not the sole criteria used in determining the qualifications of potential candidates. Plaintiff did not have

recent experience in the operating room, while the new hires did. Id. at 54:6-8; Def.'s Ex. 7. The recent graduates impressed Dr. Ackerman as being very enthusiastic and pro-patient, while the feedback he received regarding plaintiff was largely negative. Ackerman Dep. 18:14-19:2, 20:4-20, 21:19-22:17. Plaintiff complained to a number of people that she had been denied the position on the basis of race, but did not file an official complaint. Warren Dep. 85:14-87:9. She did not apply for a fourth PA position that opened the following year. Id. at 90:10-19.

In September of 2001, the Hospital hired Dr. Moises Tenembaum to be the Director of Surgery. Def.'s 56.1 Stmt ¶ 51. Dr. Tenembaum arranged with the Hospital to hire two PAs, Ms. Fyberg and Mr. Bernstein, with whom he had worked for a number of years. These PAs were specifically hired to work in the Hospital operating room, in order to continue working with Dr. Tenembaum. Dep. of Dr. Moises Tenembaum ("Tenembaum Dep.") 13:3-25. They began working at the Hospital in December, 2001. Def.'s 56.1 Stmt. ¶ 54.

After not receiving any of the slots that opened up in the Orthopedic Department, plaintiff complained to a Union[1] representative that she was being denied promotions and transfers on the basis of her race. Warren Dep. 95:3-8. Ms. Rauls met with the Executive Vice President of the Union to discuss

---

[1] At the time, the Hospital and Union were in negotiations to have the PAs join the 1199/SEIU, New York's Health and Human Services Union, AFL-CIO ("Local 1199").

plaintiff's situation. Def.'s 56.1 Stmt. ¶ 44. The issue was raised again during negotiations between the Union and Hospital. Id. at ¶ 45. On November 1, 2001, the Union and Hospital entered into a Memorandum of Agreement ("MOA"). Id. at ¶ 46. As part of the agreement, the Hospital agreed to transfer plaintiff to the Surgical Department, as she had desired. A separate letter, also dated November 1, 2001, memorialized this agreement. The agreement provided that the Hospital could assign plaintiff to the day or evening shift. Id. at ¶ 48. Plaintiff was to begin working in the Surgical Department on Dec. 1, 2001, though her actual start date was February 6, 2002. Id. at ¶ 50. Plaintiff did, however, receive the pay increase that accompanied the transfer starting December, 2001. Id. at ¶ 51.

Towards the end of February, 2002, plaintiff received a proposed schedule from her supervisor Dr. Soojin Kim. Id. at ¶ 63. The schedule outlined her work hours for the upcoming month, and included some night shifts. Id. at ¶ 66. Plaintiff did not want to work night shifts and complained to the Hospital and the Union. On March 1, 2002 plaintiff met with the Hospital's Labor Relations Manager and a Union representative to discuss plaintiff's objection to the proposed schedule. Id. at ¶ 71. Plaintiff was reminded that she agreed to work night shifts in the MOA signed in November 2001. Aff. of Barbara Felker Scott ("Scott Aff.") ¶ 12. The Hospital claimed that the night shifts were necessary in order to provide 24-hour coverage for the Surgical Department. Id. at ¶ 13. Plaintiff was told that she

could either agree to work some evening shifts or return to her previous position, where only day shifts were required. Id. at ¶¶ 11-14. Later that day, Union representatives called plaintiff and told her that "it doesn't look good for you" and that "you really needed to make a decision." Warren Dep. 186:12-20. The following Monday, plaintiff had chest pain and was too ill to return to work. She has been on medical leave since March 2002. Def.'s 56.1 Stmt. ¶¶ 77-78.

## Discussion

### (1)

### Summary judgment standards and the parties' allegations

A motion for summary judgment is granted when there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The function of the court is not to resolve any questions of fact, but only to determine whether there is disagreement over any of the material facts. In making a determination for summary judgment, the court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn in favor of the party opposing summary judgment." Fitzgerald v. Henderson, 251 F.3d 345, 360 (2d Cir. 2001) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). Thus, "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak

issue of fact as to whether the employer's reason was untrue and
there was abundant and uncontroverted independent evidence that
no discrimination had occurred." Reeves v. Sanderson Plumbing
Prods., Inc., 530 U.S. 133, 148 (2000); see also Schnabel v.
Abramson, 232 F.3d 83, 90 (2d Cir. 2000) ("Reeves clearly
mandates a case-by-case approach, with a court examining the
entire record to determine whether the plaintiff could satisfy
[her] ultimate burden of persuading the trier of fact that the
defendant intentionally discriminated against the plaintiff.")
(internal quotation marks omitted); Roge v. NYP Holdings, Inc.,
257 F.3d 164, 167-68 (2d Cir. 2001). The district court should
not view the evidence in a piecemeal fashion, but must look at
the totality of the circumstances. Fitzgerald, 251 F.3d at 360.

     Plaintiff claims that she was subject to disparate treatment
while working in the Surgical Department in retaliation for
complaining about the alleged discriminatory treatment. The
alleged disparate treatment can be broken down into five
components: (1) Although the agreement stipulated that plaintiff
begin working in the Surgical Department on Dec. 1, 2001, she did
not begin until February 6, 2002. Id. at ¶ 50. (2) Plaintiff
was paid less than the two PAs brought in with Dr. Tenembaum
despite having worked at the Hospital longer. Pl.'s Rule 56.1
Statement ("Pl.'s 56.1 Stmt.") ¶ 43. (3) Plaintiff was assigned
a labor-intensive workload, covering the emergency room, the
recovery room, the pre-surgical holding area and doing surgical
consults, while the newly hired PAs worked exclusively in the

                               8

operating room. Warren Dep. 172:6-22. (4) Plaintiff was scheduled to work night shifts (although she never actually did). Def.'s 56.1 Stmt. ¶ 66. (5) Plaintiff did not receive the pharmacy orientation that the other PAs received until she complained to the Human Resources Department. Warren Dep. 144:7-15.

The Hospital responds that there were valid, non-discriminatory reasons for plaintiff's complaints. (1) The delay in transferring plaintiff to the Surgical Department was due to a search for plaintiff's replacement in Pre-Admission Testing. Rauls Dep. 74:6-13. Plaintiff suffered no injury from this delay, as she was paid the higher salary starting December 1. (2) The PAs brought in with Dr. Tenembaum had more experience as surgical PAs, and were, therefore, entitled to a higher salary. Tenembaum Dep. 13:3-25. (3) The newly hired PAs were brought in for the sole purpose of working with Dr. Tenembaum in the operating room. Warren Dep. 177:16-24. Furthermore, the one time she did work in the operating room the surgeons she assisted reported that she "[was]n't really good in the Operating Room." Id. at 189:16-21. (4) The MOA that plaintiff signed expressly provided that she was obligated to work night shifts. Def.'s 56.1 Stmt. ¶ 48. Moreover, plaintiff was not singled out to work night shifts since all PAs had been assigned some night shifts. Scott Aff. ¶¶ 7-8.

## Statute of Limitations

As a threshold matter, defendant argues that many of plaintiff's claims are barred by the statute of limitations. The statute of limitations varies for each of the charges that plaintiff alleges. Title VII complaints must be filed with the EEOC within 300 days of the alleged discriminatory actions. 42 U.S.C. § 2000e-5(e)(1). If the plaintiff does not file a charge with the EEOC within that time period, the claim is not actionable. See Forsyth v. Fed'n Empl. & Guidance Serv., 409 F.3d 565, 573 (2d Cir. 2005); (citing AMTRAK v. Morgan, 536 U.S. 101, 113 (2002)). Section 1981 has a four-year statute of limitations. Jones v. R.R. Donelly & Sons, Co., 541 U.S. 369, 382-83 (2004); Fernandez v. M & L Milevoi Mgmt., Inc., 357 F.Supp. 2d. 644, 651 (E.D.N.Y. 2005). The New York State and New York City Human Rights Laws are governed by the three-year statute of limitations articulated in N.Y.C.P.L.R. § 214(2) (McKinney 2003). See Forsyth, 409 F.3d at 572.

Plaintiff filed her EEOC complaint on November 18, 2002. Def.'s Ex. 15. Thus, any alleged complaints of discrimination under Title VII that occurred prior to January 22, 2002 are untimely. This would leave only one justiciable Title VII complaint: plaintiff's complaint regarding her treatment in the Surgical Department in February 2002. The state and city Human Rights Laws each have a three-year statute of limitations. Plaintiff filed her summons and complaint with this court on

January 3, 2003.  Therefore, any claims of discrimination that occurred before January 3, 2000 are time-barred.  Specifically, the hiring of Stacey Slovin, which occurred in November, 1999 is untimely.  The four-year statute of limitations for Section 1981 includes all the alleged discriminatory acts.  To summarize, defendant contends that all of plaintiff's Title VII claims are barred except for the incidents in the Surgical Department.  Defendant concedes that the HRL and NYCHRL claims are all timely except for Stacey Slovin's hiring, and all Section 1981 claims are timely.

Plaintiff responds that none of the violations should be time-barred, but should be permitted under the doctrine of continuing violations.  The doctrine of continuing violations allows plaintiffs to file certain discrimination claims even after the statute of limitations has passed.  The purpose of this doctrine is to allow the inclusion of actions whose discriminatory character was not apparent at the time they occurred.  See Provencher v. CVS Pharm., 145 F.3d 5, 15 (1st Cir. 1998).  The continuing violations doctrine is not intended to allow employees a second chance to bring stale claims once the statute of limitations has passed.  Carter v. West Publ'g Co., 225 F.3d 1258, 1264 (11th Cir. 2000).  In order to make a continuing violation claim, the plaintiff must demonstrate that there was an ongoing policy or practice of discrimination by the employer.  Quinn v. Green Tree Credit Corp., 159 F.3d 759, 766 (2d Cir. 1998).  "Multiple incidents of discrimination, even

similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." Id. at 765.

When a discriminatory act is considered separate or discrete, there can be no continuing violation claim, and all claims beyond the statute of limitations are barred. See Forsyth, 409 F.3d at 572. The Supreme Court has held that "termination, failure to promote, [and] denial of transfer" are discrete acts under the continuing violation doctrine. AMTRAK, 536 U.S. at 114. The well-established law in this circuit is consistent with AMTRAK. See Lightfoot v. Union Carbide Corp., 110 F.3d 898, 907 (2d Cir. 1997); Crosland v. City of New York, 140 F. Supp. 2d 300, 308 (S.D.N.Y. 2001). The reasoning behind these rulings is intuitive. Denial of transfer, termination or failure to promote are discrete acts which are easy to identify. See AMTRAK, 536 U.S. at 114. The plaintiff should have been aware of any such acts of discrimination, and filed a complaint promptly.

In this case, each of the alleged acts of discrimination was a discrete instance of failing to hire. Accordingly, plaintiff cannot avail herself of the continuing violation doctrine, and consideration of plaintiff's claims will be limited to those alleged acts of discrimination that occurred within the applicable limitations period.

**Employment Discrimination**

**a.    Title VII**

Employment discrimination cases brought under Title VII are
governed by the framework established by the Supreme Court in
McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See also
Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).
Under McDonnell Douglas, the plaintiff has the initial burden of
establishing a prima facie case of discrimination.  McDonnell
Douglas, 411 U.S. at 802.  In order to establish a prima facie
case, the plaintiff must show (1) membership in a protected
class; (2) satisfactory job performance or qualifications for the
job that the employer was seeking applicants; and (3) an adverse
employment action; (4) which occurred under circumstances giving
rise to an inference of discrimination on the basis of
plaintiff's membership in that protected class.[2]  See id.; Farias
v. Instructional Sys., 259 F.3d 91, 98 (2d Cir. 2001).

If the plaintiff establishes a prima facie case, the burden
shifts to the defendant to offer a legitimate, non-discriminatory
reason for the adverse employment action.  McDonnell Douglas, 411
U.S. at 802.  This burden is only of production, and not of
persuasion.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S.
133, 142 (2000).  Indeed, the burden of persuasion remains with
the plaintiff throughout the case.  Id. at 143.  After the

---

[2] The fourth element may be demonstrated when, for example, the
position was filled by someone who was not a member of the
protected class.

employer offers its reason, the burden then shifts back to the plaintiff, who must prove that the reason given by the defendant was pretextual.  <u>McDonnell Douglas</u>, 411 U.S. at 804.

**b.    Section 1981**

Section 1981 employment discrimination claims are analyzed under the same burden-shifting framework as Title VII.  <u>Wong v. Kings County Dist. Attorney's Office</u>, No. 02-cv-3740, 2004 WL 692165, at *3 (E.D.N.Y. Mar. 31, 2004).  However, Section 1981 requires proof of intentional discrimination, a higher standard than that of Title VII cases.  <u>Patterson v. County of Oneida</u>, 375 F.3d 206, 226 (2d Cir. 2004).  Therefore, if summary judgment is granted to the defendant for the Title VII claim based on a given incident, <u>a fortiori</u>, summary judgement will be granted for the Section 1981 claim based on the same incident.  <u>Id.</u> at 226.

**c.    State and City Human Rights Law**

The legal standard for New York State and City human rights law largely parallels that of Title VII.  <u>See</u> <u>Mack v. Otis Elevator Co.</u>, 326 F.3d 116, 122 n.2 (2nd Cir. 2003); <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 565 n.1 (2d Cir. 2000).[3]  With these various standards in mind, the facts of the case will be

---

[3] The New York City law has been recently amended so that it no longer strictly parallels Title VII.  However, none of these changes affect the analysis of this case.  <u>See</u> Craig Gurian, <u>A Return to Eyes on the Prize: Litigating Under the Restored New York City Human Rights Law</u>, 33 Fordham Urb. L.J. 255 (2006).

considered.

**(4)**

**Plaintiff's Claims**

**a.   Stacey Slovin's hiring.**

As discussed previously, most of plaintiff's claims with regards to the hiring of Ms. Slovin are time-barred.  Only her Section 1981 claim is still timely.  It is unclear exactly what cause of action plaintiff claims by Ms. Slovin's hiring.  In the complaint, plaintiff claims that the Hospital's policy of not posting jobs in a public forum denied plaintiff and other minorities the opportunity to apply for job openings.  Pl.'s Amended Complaint ¶¶ 10, 11.  Another possibility, not mentioned by the plaintiff, is that the hiring of Ms. Slovin instead of plaintiff was the discriminatory act.[4]  However, neither of the Hospital's actions form the basis of a discrimination claim.

Section 1981 guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts."  42 U.S.C. § 1981.  In 1991 Congress amended the law by defining "make and enforce contracts" to include the "termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).  This means that claims of a hostile work environment, wrongful termination, and failure-to-transfer are included in Section

---

[4] Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. ("Pl's Memo") makes no mention of the Slovin hiring.

1981.  See Jones, 541 U.S. at 383.  In order to violate Section 1981, an employer must intentionally discriminate, and the discrimination must be a substantial or motivating factor for the employer's actions.  Tolbert v. Queens College, 242 F.3d 58, 69 (2d Cir. 2001).

At the time of Ms. Slovin's hiring, the Hospital did not have a policy mandating that all job openings be posted in the Hospital.  Rauls Dep. 11:13-20.  Some positions were posted publicly as part of a collective bargaining agreement with the Union.  Id. at 11:23-25.  There was no requirement to post open PA positions.  Id. at 12:4-12.  PAs were either recruited by the department that was looking for the PA or by the Human Resources Department ("HR").  Id. at 12:15-21.  Individual departments often had resumes on file from which they hired directly.  Id. at 13:22-14:9.  All job seekers were permitted to write directly to department heads to inquire about job openings and submit applications directly to the respective departments.  Id. at 14:13-23.  Employees in the Hospital who were interested in job openings were permitted to give a resume to HR to place on file.  HR held the resume for six months and if the desired position opened up, it would contact the employee.  Id. at 20:5-10.

Plaintiff cites no evidence that the Hospital employment policy was enacted in order to discriminate against minorities, nor that it affected minorities disproportionately.  All potential job applicants, minority or otherwise, were in the same position when applying for a job; i.e., they had to inquire about

16

job openings rather than simply rely on postings.  As such, the Hospital policy did not violate Section 1981.

Likewise the decision to hire Ms. Slovin instead of plaintiff also does not support a Section 1981 claim.  Both plaintiff and Dr. Cosgrove (the individual in charge of filling the job opening) agree that Dr. Cosgrove was not aware that plaintiff sought a position in his department.  Warren Dep. 66:15; Cosgrove Aff. ¶ 10.  It logically follows that his decision not to hire plaintiff could not have been discriminatory.  See Buchholz v. Rockwell Int'l Corp., 120 F.3d 146, 150 (8th Cir. 1997) (supervisor who was unaware that plaintiff applied for position proffered a legitimate, non-discriminatory reason for not hiring plaintiff).  Lacking any evidence of intentional discrimination, the Hospital's hiring of Stacey Slovin does not support plaintiff's 1981 claim.  See Ganthier v. North Shore-Long Island Jewish Health Sys., 298 F. Supp. 2d 342, 347-48 (E.D.N.Y. 2004).


**b.   Orthopedic Department positions**

As discussed previously, plaintiff's Title VII charges are time-barred for this claim.  Her State, City, and Section 1981 claims are still timely.  As the State and City Human Rights Laws mirror Title VII claims, her claims will be analyzed under that framework.

Plaintiff easily establishes her prima facie case for this incident:  (1) as a minority, she is a member of a protected

17

class, and (2) her many years of service in the health care industry qualify her for the job. The Hospital's denial of promotion in favor of three Caucasian males with less work experience than her (3) constitutes an adverse employment action (4) that gives rise to an inference of discrimination.

The Hospital proffered two primary reasons for not hiring plaintiff for the Orthopedic Department: (1) plaintiff had a reputation as not being particularly good with patients, while the three Caucasian males who were hired seemed very enthusiastic and pro-patient, and (2) the Caucasian males had recent experience in the operating room, while plaintiff had no recent experience. Plaintiff responds that these reasons are wrong and pretextual. Plaintiff asserts that she was clearly more qualified for the job than the three Caucasians. She had many years of hospital experience while the three Caucasians were all recent graduates with no experience. Plaintiff also contests the Hospital's assertion that she did not have good patient skills. She introduced into evidence three affidavits from colleagues in the Hospital who all attest that she was a good worker. Pl.'s 56.1 Stmt. ¶ 28. The Hospital notes that none of the three colleagues actually worked in the Orthopedic Department. Def.'s Reply at 4. They made no assertions about how the physicians in the Orthopedic Department, such as Dr. Reddy and Singha, regarded plaintiff's abilities, which was the information upon which Dr. Cosgrove based his hiring decision. Id. Furthermore, plaintiff did eventually receive a position in the Surgical Department, as

she desired.  Def.'s 56.1 Stmt. ¶ 46.  This promotion undercuts her allegation of discrimination.  <u>See</u> <u>Hines v. Hillside Children's Ctr.</u>, 73 F. Supp. 2d 308, 319 (W.D.N.Y. 1999) ("Greatly undercutting plaintiff's allegations of discrimination and retaliation is the fact that he <u>was</u> ultimately promoted to supervisor").

An employer's decisions are given deference by the court unless they are clearly pretextual.  "It is not the function of a fact finder to second guess business decisions." <u>Fahmy v. Duane Reade, Inc.</u>, No. 04-1798, 2006 WL 1582084, at *7 (S.D.N.Y. Jun. 9, 2006) (citing <u>Dister v. Cont'l Group, Inc.</u>, 859 F.2d 1108, 1116 (2d Cir. 1988)).  "Determining how to evaluate a candidate's . . . record and how to weigh various factors in making a promotion decision is precisely the sort of decision in which courts do not intervene without evidence that the employer's claimed reason was so lacking in merit as to call into question its genuineness." <u>Id.</u>  While work experience is certainly one factor in deciding whether to hire someone, it is by no means the only, or even necessarily the dominant factor.  It is well within the Hospital's discretion to value recent training and better patient skills over general work experience.  <u>See, e.g.</u>, <u>Byrnie v. Town of Cromwell Bd. of Educ.</u>, 243 F.3d 93, 102-105 (2d Cir. 2001) ("When a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the

employer's explanation was pretextual, but that the pretext
served to mask unlawful discrimination.").  There is no
requirement that the Hospital make the wisest employment
decision, only that it make a non-discriminatory one.  Hines, 73
F. Supp. 2d at 320.  Plaintiff's claim that her work experience
made her the most qualified candidate does not automatically make
it so.  "An employee's subjective opinion about his own
qualifications is insufficient to give rise to a triable issue of
fact concerning whether the employer's proffered reason for its
actions is a pretext for discrimination."  Id. at 315.  Thus,
plaintiff's assessment of her own qualifications is insufficient
to establish pretext.

Moreover, an employer is entitled to base employment
decisions on subjective criteria, such as performance during an
interview.  Byrnie, 243 F.3d at 104.  These subjective standards
should be articulated in a clear and specific fashion, so as to
avoid the impression that the subjective standards are merely a
cover for discriminatory reasons.  Id. at 105.  "Where an
employer's explanation, offered in clear and specific terms, is
reasonably attributable to an honest even though partially
subjective evaluation of ... qualifications, no inference of
discrimination can be drawn."  Id. (quoting Lieberman v. Gant,
630 F.2d 60, 67 (2d Cir. 1980)) (internal quotations omitted).
Dr. Cosgrove and the Hospital did not make bald assertions that
the plaintiff was not qualified.  They pointed to specific
criteria, namely, patient skills, which they thought plaintiff

lacked but the Caucasian males possessed.

Plaintiff brings the testimony of three colleagues who all say that plaintiff was a good worker in order to undermine the Hospital's claim that she was not good with patients and establish an inference of pretext. Plaintiff misunderstands the scope of the Hospital's assertions, and in doing so, fails to establish an inference of pretext. Dr. Ackerman consulted the physicians in his department who said that plaintiff had poor patient skills. This does not preclude the possibility that other employees in different departments had a different assessment of plaintiff's skills. The key issue is that Dr. Ackerman, who was making the employment decision, received negative feedback about plaintiff. Even if the information he received about plaintiff was wrong, it does not, without more, create an inference of pretext. An inaccurate, but honestly held belief about an employee does not establish a claim of pretext. See Saunders v. New Horizons Computer Learning Ctr., No. 99-cv-9532, 2002 WL 1067823, at *4 (S.D.N.Y. May 29, 2002) ("An employer's belief that an employee violated company policy need not be accurate to serve as a legitimate reason for termination, as long as that belief was honestly held." (citing Dister, 859 F.2d at 1112)). Wrong opinions are not illegal, only discriminatory ones. In order to successfully refute the Hospital's proffered reason, plaintiff would have to show that Dr. Ackerman knew that plaintiff had good patient skills, and still claimed that she did not.

Plaintiff argues that the different reasons offered by defendant for not hiring plaintiff are evidence of pretext. Pl.'s Memo at 10-13. In his deposition, Dr. Ackerman testified that he contacted Ms. Rauls in the Human Resources Department to let her know that he needed to hire PAs so that she could post an ad or pull resumes from her files. Ackerman Dep. 11:3-12:5. Dr. Ackerman told Ms. Rauls that his first priority was to hire PAs who were "pro-patient," and that he also wanted people who were enthusiastic and dedicated. Id. at 12:6-13:6. Dr. Ackerman testified that Ms. Rauls forwarded several resumes to him; however, he could not remember whether the resumes she forwarded included those of the persons he ultimately hired, Isaac Abramchayev, Sadyk Fayzilayev and Boris Khaimov. Id. at 16:4-23, 25:25-26:4. Those three individuals impressed Dr. Ackerman in their interviews as being particularly enthusiastic and pro-patient. Id. at 18:14-20:18. Each of the three candidates who were hired were fresh out of training and had not previously worked at the Hospital.

Dr. Ackerman testified that he also interviewed plaintiff, and that he consulted with other doctors in the Orthopedics Department about her. Two of the doctors he consulted – Drs. Reddy and Singha – provided Dr. Ackerman with negative feedback, telling him that plaintiff was not particularly good with patients. Id. at 21:9-22:13.

Plaintiff contrasts Dr. Ackerman's testimony with that of Ms. Rauls, who testified that the individuals who were hired for

the PA positions were recruited "through the department head [Dr. Ackerman]."  Rauls Dep. 41:15-42:7.  She also stated that Dr. Ackerman had told her that the reason he had chosen those three individuals for the PA jobs "was that he felt that they would be able to be basically molded to perform and participate in surgical procedures the way he wanted them to be trained."  Id. at 43:25-44:20.

Once again, plaintiff misunderstands the nature of the Hospital's evidence.  The multiple reasons defendant raised for not hiring plaintiff are not conflicting, but complementary.  Dr. Ackerman's stated preference for candidates who were "pro-patient" and enthusiastic is not inconsistent with Ms. Raul's recollection that Dr. Ackerman sought candidates whom he could "mold[] to perform."  Indeed, the fact that the three individuals Dr. Ackerman hired were fresh from their training lends credence to the explanation that he wanted PAs he could train to perform in accordance with his individual surgical procedures.  In giving multiple reasons, the Hospital is painting a complete and accurate picture of its decision, not obfuscating a discriminatory reason.  See Roge, 257 F.3d at 170.

When evaluating whether an employer's reason is pretextual, a court must assess many factors.  Reeves, 530 U.S. at 148-149.  It not only evaluates the stated reasons of employer and employee, but looks at all possible facts that would give rise to an inference of discrimination.  Prior to the hiring of the three Caucasian PAs, one of the two PAs in the Orthopedic Department,

Renata Hartung, was an African-American. <u>Supra</u> at 4. Ms.
Hartung submitted an affidavit in support of the Hospital's
motion, in which she claims that in February 2000, Dr. Ackerman
"went to much effort to convince [her] to retain [her] position
[as a PA] in Orthopedic Surgery." Hartung Aff. ¶ 8. This fact
combined with the lack of any discriminatory actions or comments
weakens plaintiff's claim of discrimination. <u>See, e.g.</u>, <u>Lizardo
v. Denny's, Inc.</u>, 270 F.3d 94, 104 (2d Cir. 2001) (stating that
the lack of discriminatory comments and the non-discriminatory
treatment of other minorities weakened the plaintiff's claim of
discrimination). Indeed, plaintiff has produced no evidence
whatsoever that Dr. Ackerman's hiring decision was racially
motivated. Accordingly, plaintiff has failed to create a jury
question on the issue of pretext. <u>See</u> <u>Roge</u>, 257 F.3d at 170-71.

**c.    Retaliation claims**

Plaintiff claims that she was subject to disparate treatment
in retaliation for complaining to the Union about the Hospital's
discriminatory practices. Retaliation claims are governed by the
same burden-shifting framework of <u>McDonnell Douglas</u>. <u>Richardson
v. New York State Dep't of Correctional Serv.</u>, 180 F.3d 426, 443
(2d Cir. 1999). "To establish a prima facie case of retaliation,
the employer must show (1) participation in a protected activity
that is known to the defendant, (2) an employment decision or
action disadvantaging the plaintiff, and (3) a causal connection
between the protected activity and the adverse decision." <u>Id.</u>

Plaintiff's complaint to the Union easily qualifies as a protected activity.  In order to consider an employment decision disadvantageous to the plaintiff, it must likely dissuade "a reasonable worker from making or supporting a charge of discrimination."  <u>Burlington Northern & Santa Fe Ry. Co. v. White</u>, ___ U.S. ___, 126 S.Ct 2405, 2415 (2006).  At the same time, however, "Title VII . . . does not set forth a general civility code for the American workplace."  <u>Id.</u>  "Not every unpleasant matter short of [discharge or demotion] creates a cause of action for retaliatory discharge."  <u>Richardson</u>, 180 F.3d at 446 (quoting <u>Wanamaker v. Columbian Rope Co.</u>, 108 F.3d 462, 466 (2d Cir. 1997)).  There is no bright line standard, and the district court must make case-by-case determinations in deciding whether an employment action is considered adverse.  <u>Id.</u>  A causal connection can be established by showing temporal proximity between the protected activity and the employment actions.  <u>Cifra v. G.E. Co.</u>, 252 F.3d 205, 217 (2d Cir. 2001).  The closer the two events occur, the stronger the causal connection.  However, a gap of less than two months between a complaint and an adverse action can establish a causal connection.  <u>Quinn</u>, 159 F.3d at 769.  The record does not show when plaintiff first complained to the Union.  However, it is clear that a meeting where plaintiff's complaints were discussed was held on November 1, 2001.  The first alleged adverse action – the delay in transferring to the Surgical Department – occurred on December 1 of that year.  The one-month period provides the

temporal proximity necessary to establish a causal connection. Therefore, plaintiff's retaliation claims hinges on her ability to demonstrate that she was subject to adverse employment actions, and, if she can, defendant's ability to provide legitimate reasons for those actions.  Plaintiff points to five actions that she claims were adverse.

### i.  Delay in transferring to the Surgical Department

The agreement signed between plaintiff and the Hospital stipulated that she would begin working in the Surgical Department starting December 1, 2001.  She did not actually start working there until February 6, 2002.  The Hospital, however, began paying her the increased salary from the 1st of December. This Circuit has held that delays in reassignment do not constitute an adverse employment action.  <u>Galabya v. New York City Bd. of Educ.</u>, 202 F.3d 636, 640 (2d Cir. 2000) (finding that a delay in transfer where there was no loss of salary is not an adverse employment action).  Lacking any adverse employment action, plaintiff fails to establish a prima facie claim of retaliation for this employment action.

Even if plaintiff could satisfy her prima facie case, the Hospital has proffered legitimate non-discriminatory reasons for its actions.  The delay in transferring plaintiff to her new position was, by plaintiff's own admission, due to the Hospital's search for plaintiff's replacement.  Warren Dep. 129:15-132:20. Plaintiff claims the Hospital's reason is a pretext, as a

colleague of plaintiff, Mercy Joseph, informed the Hospital that she was available to fill plaintiff's position immediately. Pl.'s Memo at 17. Plaintiff's claim is not sufficient to establish a claim of pretext. While it may be true that there were people ready to fill plaintiff's position earlier, the person who the Hospital hired to fill plaintiff's spot was to begin on February 6th. Warren Dep 131:9-18.

### ii. Salary differential between plaintiff and other PAs in the Surgical Department

Plaintiff's salary for the new position in the Surgical Department was $69,781. Ms. Fyberg, one of the other PAs hired by the Hospital around the same time, received a salary of $75,000, despite the fact that she had less experience as a PA than plaintiff. Pl.'s 56.1 Stmt. ¶ 43. A material loss of benefits, such as receiving a lower salary than similarly situated colleagues is considered an adverse employment action. Galabya, 202 F.3d at 640. As such, plaintiff's prima facie case is satisfied. The Hospital responds that Ms. Fyberg was given a higher salary because she had many more years' experience working as a PA in the operating room. Def.'s 56.1 Stmt. ¶ 53. The reason given by the Hospital is a reasonable one. See Fleary v. New York Mortg. Agency, No. 04-cv-1557, 2006 WL 335701, at *9 (E.D.N.Y Feb. 13, 2006) ("Seniority and different job responsibilities are legitimate, non-discriminatory reasons for pay disparities."). Plaintiff cites no evidence to show that the Hospital's reason is pretextual and, therefore, her retaliation

claim fails for this employment action.

### iii. Plaintiff's workload in the Surgical Department

Plaintiff alleges that she was given a more strenuous schedule than two other PAs, Ms. Fyberg and Mr. Bernstein.  Id. at 45.  Plaintiff had to work in a number of different areas in the Surgical Department, while the two other PAs were assigned exclusively to the OR.  Id.  A more strenuous workload can be considered an adverse employment action.  Burlington Northern, 126 S.Ct at 2416.  As such, plaintiff's prima facie case is satisfied.  The Hospital responds that it had legitimate non-discriminatory reasons for its actions.  Ms. Fyberg and Mr. Bernstein had extensive experience working with Director of Surgery, Dr. Tenembaum, and were hired by the Hospital specifically to work with him.  Plaintiff was given an opportunity to work in the OR and it did not go well.  The reasons given by the Hospital for the plaintiff's work assignment in the Surgical Department are reasonable and non-discriminatory. See Scaria v. Rubin, No. 94-cv-3333, 1996 WL 389250, at *8, 11 (S.D.N.Y. July 11, 1996) (finding that a preference to hire an individual "whose work habits and effectiveness are known to the employer" over someone with superior academic credentials is a legitimate non-discriminatory basis for an employment decision) (quoting Philippeaux v. North Central Bronx Hospital, 871 F. Supp. 640, 651 (S.D.N.Y. 1994)).  Plaintiff fails to cite any evidence of pretext, and therefore, her retaliation claim fails

for this employment action.

### iv.  Night shifts

Plaintiff claims that the Hospital engaged in retaliatory behavior when it scheduled her to work night shifts.  Plaintiff's claim fails for a number of reasons: (1) scheduling inconveniences are not considered adverse employment actions; Allen v. St. Cabrini Nursing Home, Inc., 198 F. Supp. 2d 442, 449 (S.D.N.Y. 2002); (2) plaintiff signed a document in which she expressly agreed to work night shifts; and (3) plaintiff was not singled out to work night shifts as all PAs were to be assigned night shifts.  Because has failed to produce evidence supporting a prima facie case of retaliation for the night shifts, her claim based on them is dismissed.

### v.  Pharmacy orientation

Plaintiff claims that the Hospital retaliated against her by not providing her with the proper training to equip her for the job.  Plaintiff is only able to point to one training session that she did not receive, the Pharmacy Orientation.  Once again, plaintiff's claim fails.  Plaintiff was given the training as soon as she requested it.  Def.'s 56.1 Stmt. ¶¶ 59-60.  She cites no evidence that the other PAs were given it automatically.  Even were this the case, the Hospital's action are not severe enough to dissuade "a reasonable worker from making or supporting a charge of discrimination."  Accordingly, the Pharmacy orientation

does not support her claim of retaliation.

## Conclusion

There is no evidence of adverse employment actions, or facts that would establish an inference of discrimination under Section 1981, Title VII, or the New York State and City Human Rights Law. Plaintiff has failed to establish viable claims for any of the assorted violations she alleges. Therefore, defendant's motion for summary judgment is granted. The Clerk of the Court is directed to close the case.


Dated:     Brooklyn, New York
           September 29, 2006


                              SO ORDERED:


                              _____/s/_____
                              David G. Trager
                              United States District Judge